UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X **Docket#**
KEVIN LANGSTON,                : 07-cv-2630(ERK)
               Plaintiff,      :
                               :
    - versus -                 : U.S. Courthouse
                               : Brooklyn, New York
JOSEPH SMITH,                  :
               Defendant       : April 14, 2010
------------------------------X

TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
BEFORE THE HONORABLE EDWARD R. KORMAN
UNITED STATES DISTRICT JUDGE

**A   P   P   E   A   R   A   N   C   E   S:**


**For the Plaintiff**:        **Warren S. Landau, Esq.**
                              448 West Broadway
                              Cedarhurst, NY 11516, Esq.


**For the Defendant**:        **Morgan Dennehy, Esq.**
                              Kings County
                              District Attorney's Office
                              350 Jay Street
                              Brooklyn, New York


**Official Transcriber**:     **Rosalie Lombardi**
                                     **L.F.**


**Transcription Service**:    **Transcription Plus II**
                              3589 Tiana Street
                              Seaford, N.Y.  11783
                              (516) 358-7352
                              Transcriptions2@verizon.net


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

### Proceedings

1          THE CLERK:  Langston v. Smith.  Your
2    appearances, counsel.
3          MR. LANDAU:  For the petitioner, Warren S.
4    Landau, Associated with Lynn Fahey of Appellate
5    Advocates, attorney for petitioner.
6          MR. DENNEHY:  For the respondent, Morgan
7    Dennehy, Kings County District Attorney's Office.
8          MR. LANDAU:  Your Honor, we come before the
9    Court on a petition for habeas corpus.  Our petition
10   alleges one major ground and two points in support of
11   that.  We have alleged that there's insufficient evidence
12   to support the accomplice liability of petitioner for the
13   convictions of criminal possession of a weapon and first
14   degree felony assault.  And in addition, there was
15   insufficient evidence proving that the assault of the
16   Police Officer, Marquez (ph.) was in furtherance of the
17   felony of criminal possession of a weapon.  Because of
18   this --
19         THE COURT:  Sir, I quickly glanced over this,
20   but he served a sentence on that; hasn't he?
21         MR. LANDAU:  Well he is incarcerated, Your
22   Honor.
23         THE COURT:  No, no, but he's incarcerated on
24   the other counts.
25         MR. LANDAU:  Yes.

3

**Proceedings**

1          THE COURT:  In other words, he's already --

2          MR. LANDAU:  He's incarcerated on the major

3    count as far as I can tell.

4          THE COURT:  Right.  But he's basically -- you

5    know if we had a rational concurrent sentence doctrine

6    assuming the other sentences survive, this is really --

7    it almost -- it makes no difference in terms of his

8    incarceration.

9          MR. LANDAU:  Right.  It's on the major count

10   that, I mean -- New York Law has a provision that

11   indicates that the sentence merge but that aside, yes,

12   he's finished that portion of --

13         THE COURT:  Well it didn't merge, it --

14         MR. LANDAU:  Right.

15         THE COURT:  Let's put it this way, if the only

16   relief I gave you was on that, it wouldn't do him any

17   good, realistically in terms of the time he would have to

18   serve.

19         MR. LANDAU:  It would not effect his time.

20         THE COURT:  Right.

21         MR. LANDAU:  But for that -- but for the second

22   conviction, the more serious one, he would have been out

23   of jail by now.

24         THE COURT:  Right.  Right.

25         MR. LANDAU:  I think our papers pretty much

4

**Proceedings**

1  state our argument.  There was -- we believe that due

2  process was violated and that the Appellate Division did

3  not engage in a reasonable -- did not arrive at a

4  reasonable conclusion based on the facts of this case and

5  the law in concluding that his conviction should be

6  affirmed.

7          There was no evidence from which a rational

8  jury could have concluded that petitioner had any advance

9  knowledge that this was going to be a robbery as opposed

10  to simple gun sale.  And the gun sale wasn't what he was

11  charged or at least wasn't what he was convicted of.

12          Furthermore, there's no evidence that -- from

13  which a rational jury could have concluded that

14  petitioner's -- that the felon -- that the assault of the

15  Officer Marquez by some of the co-defendants was in

16  furtherance of a criminal possession of a weapon and I

17  note that the only weapon it could have been -- that

18  could have been related to it would have been the 22

19  caliber --

20          THE COURT:  You're getting me confused with all

21  of these counts.  Let's put aside the criminal possession

22  of a weapon --

23          MR. LANDAU:  Okay.

24          THE COURT:  -- because it's really --

25          MR. LANDAU:  Right.

5

**Proceedings**

1          THE COURT:  We can deal with it.  I am not -- I

2    am going to deal with it but I don't think it's really --

3    it's not consequential.  So let's deal with the major --

4          MR. LANDAU:  Right.  I think it's only

5    consequential because the assault conviction kind of

6    piggybacks on the criminal possession conviction.  That's

7    why it's relevant, otherwise as we indicated earlier, his

8    sentence is over on that.

9          But the People had to prove two things.  They

10   had to prove accomplice liability --

11         THE COURT:  Right.

12         MR. LANDAU:  -- on the criminal possession of a

13   weapon and then they had to prove that the assault was in

14   furtherance of the criminal possession of a weapon.  We

15   submit that the People did neither of these things.  This

16   was -- there was no advance knowledge that the defendant

17   had that this was -- this was going to be a robbery, as

18   opposed to a gun sale and no rational jury could have

19   concluded that he did --

20         THE COURT:  Why couldn't a -- I don't

21   understand why a rational jury couldn't conclude that

22   there was going to be a robbery here.

23         MR. LANDAU:  Well, not that the -- but that he

24   didn't -- that the petitioner knew of a robbery and

25   therefore could have --

6

**Proceedings**

1          THE COURT:  I think a rational juror could

2    have.  I mean Judge Gleeson states the facts, you know,

3    in a fairly lucid way but it seems to me to be clear that

4    a rational jury could have concluded that there was going

5    to be a robbery here, that the whole purpose of this --

6    what was going on here was essentially to rip off two

7    people who were coming to buy guns.

8          MR. LANDAU:  Right.  But the evidence does

9    find --

10         THE COURT:  Did they ever find guns that were

11   supposed to have been the subject of the sale?

12         MR. DENNEHY:  No, your Honor.

13         THE COURT:  It's obvious there was never going

14   to be a sale of guns.

15         MR. LANDAU:  Right.  But in evaluating

16   petitioner's guilt as opposed to Cherry's guilt, we have

17   to evaluate what the evidence shows about his knowledge.

18   The fact that Cherry may have intended all along to rob

19   the police does not -- you can't conclude merely from

20   that alone that the petitioner was acting as an

21   accomplice.

22         THE COURT:  Well the question is whether -- not

23   whether you must draw that inference but whether a

24   reasonable jury could have drawn that inference.

25         MR. LANDAU:  Right.

7

**Proceedings**

1          THE COURT:  And also don't forget, they heard

2    him testify and they -- their disbelief of his testimony

3    can at least provide a partial basis for concluding,

4    along with the other evidence, that the opposite of what

5    he said was true.

6          MR. LANDAU:  I'm not so sure that I agree with

7    that, your Honor, but --

8          THE COURT:  I think it's an accurate statement

9    of the law.

10          MR. LANDAU:  The bottom line is that my view is

11   that nothing here showed his advance knowledge that

12   Cherry was -- or Cherry or the others were going to be

13   armed with a weapon, a 22 caliber and it had to be the 22

14   caliber.

15          THE COURT:  Well if you accept the assumption

16   that he knew that there was going to be a robbery, then

17   he had to have known that the robbery was going to

18   involve guns.

19          MR. LANDAU:  I think that first the perspective

20   that there was evidence that suggested that he knew about

21   this, if it's there it stretches the limits of what a

22   jury could do and what a court could find in this case.

23   I would also point out that it would be fairly strange

24   for petitioner intending this, knowing this, to have come

25   to this encounter unarmed, engaged in no acts of

8

### Proceedings

1  violence, done nothing threatening towards the police and

2  positioned themselves in such a way as that they were

3  effectively in the line of fire of apparently the three

4  other co-defendants.

5          So all of this belies that there is some proof

6  --  that there's sufficient proof that the petitioner

7  could be said to have had knowledge of the robbery and

8  therefore be connected to the possession of the 22

9  caliber.

10          In any event, getting to the second point,

11  there is -- I think there's simply no rational basis to

12  conclude that the assault could possibly be in

13  furtherance of the possession of the 22 caliber weapon

14  which has to be the case here.  This is the -- the

15  conviction is a New YOrk State conviction.  It's based on

16  New York law and New York law has to be applied and we

17  submit that that rule is dictated by Bell, Malagon and

18  Suggs (ph.), which we cited in our petition.  It would

19  just be completely irrational for the jury to have

20  concluded that the shooting of Officer Marquez in any way

21  was designed to further the possession of the 22 caliber

22  gun which was clearly not the purported subject of the

23  gun sale.

24          THE COURT:  So the first degree assault -- let

25  me just be sure, is dependent on the notion that he was

9

**Proceedings**

1   using -- is dependent on the finding that the purpose of

2   the shooting was to prevent the other people from taking

3   the gun.

4           MR. DENNEHY:  That wasn't the way it was

5   charged.  It was simply charged -- the boilerplate

6   language of the statute was read to the jury which means

7   in the course of and in furtherance of, the Commission of

8   the weapon possession crime.  So it wasn't charged

9   specifically that the jury had to find that it was -- the

10  guns were used to prevent the detectives from taking

11  their guns.  That's simply a theory on which the jury

12  could have concluded that the --

13          THE COURT:  Well tell me what the jury -- the

14  first degree assault, it was -- they had to find that it

15  was done in the course of and in furtherance of or the

16  commission of or attempted commission of the felony.

17          MR. DENNEHY:  That's correct.

18          THE COURT:  Or immediate flight therefrom, he

19  or another participant, if there be any, cause serious

20  physical injury to another person.

21          MR. DENNEHY:  Right.

22          THE COURT:  What was the felony?

23          MR. DENNEHY:  The weapon possession.  That's

24  the way it was charged.  And as Judge Gleeson pointed out

25  in his decision, he called it -- he said it would be more

10

**Proceedings**

1  natural to say that the act was in furtherance of their

2  meaning which was to rob the detectives.  But a robbery

3  wasn't charged and, in fact, a robbery -- the crime

4  wasn't charged against the defendants and, in fact, the

5  Judge declined to -- I don't know if a -- I don't think

6  an application was even made.  I think the Judge just

7  took it upon himself to charge that the fact that the

8  underlying felony was the weapon possession.  So the

9  assault had to be committed in the course of and in

10  furtherance of the weapon possession.

11         THE COURT:  It couldn't -- so it was because of

12  the Judge's charge as opposed to anything else?  It could

13  have been in furtherance theoretically of the robbery.

14         MR. DENNEHY:  Correct, it could have.

15         THE COURT:  But the Judge gave this

16  instruction.

17         MR. DENNEHY:  The Judge instructed the jury

18  that it had to be in furtherance of the weapon possession

19  in this case; correct.

20         THE COURT:  And so the whole -- so basically

21  the whole thing stands or falls on the notion that the

22  reason for the shooting was to prevent the other people

23  from getting the guns.

24         MR. DENNEHY:  Well that's an argument.  There

25  are other arguments to be made but there's a, as

11

### Proceedings

1  Judge Gleeson pointed out, sufficient nexus between the

2  actual use of the guns to evaluate the crime -- to commit

3  the crime of criminal possession of a weapon in the

4  second degree and the shooting of the detectives.

5           THE COURT:  I know, but I mean --

6           MR. DENNEHY:  It could have been to prevent the

7  detectives from taking the guns but they come out with

8  their guns, they're shooting their guns, thus committing

9  the crime, completing the crime of second degree weapon

10  possession.  And in the course of that, they're firing

11  shots at the detective, hitting the detective in the hand

12  and causing the injury necessary for the first degree

13  assault.  So the two acts are sufficiently related to

14  satisfy the in furtherance requirement.

15           I would like to point out that the New York

16  courts have consistently construed that language in a

17  very liberal fashion.  It doesn't necessarily have to

18  mean that the act has to be done, that the underlying

19  felony has to be done -- I'm sorry, that the assault has

20  to be done in furtherance of the underlying felony in the

21  sense that it has to actually advance the aim or the goal

22  of committing the underlying felony.

23           The Courts have held that simply -- mostly in

24  felony murder cases where the language is exactly the

25  same, the in furtherance language, exists as well, that

**Proceedings**

1  the act could be completely inconsequential to the actual

2  goal of committing the underlying felony such as robbery

3  cases where the defendants are fleeing and they strike

4  and hit an unsuspecting pedestrian and kill that

5  pedestrian.  There's several cases that deal with that,

6  that certainly the killing of that pedestrian in fact

7  impeded their ability to complete the robbery because

8  these defendants were caught after the accidents.  Yet

9  the murder of that civilian was sufficient to satisfy the

10  in furtherance of language.

11       THE COURT:  Because they were trying to get

12  away presumably.

13       MR. DENNEHY:  They were but my point is that

14  the killing didn't help them get away.  It didn't further

15  their ability to complete the robbery.  It impeded their

16  ability to complete the robbery.  So therefore in that

17  instance --

18       THE COURT:  Tell me the cite for that, this

19  case that you're describing.

20       MR. DENNEHY:  The case I am describing is, a

21  robbery occurs.  The defendant gets in an automobile and

22  attempts to flee the police.

23       THE COURT:  Right.

24       MR. DENNEHY:  And in the course of the chase,

25  he strikes and hits another car, killing the car's

13

**Proceedings**

1  occupant.

2        THE COURT:  Right.

3        MR. DENNEHY:  The police then arrest the

4  defendant.

5        THE COURT:  Right.

6        MR. DENNEHY:  In that instance, the killing of

7  the other motorist did not further the underlying felony

8  which in this case was the robbery.  It actually impeded

9  his ability to complete the robbery because it meant that

10  he --

11        THE COURT:  Well he was running away.  So it

12  didn't impede his ability -- I mean this was he was

13  trying to get away from the police.

14        MR. DENNEHY:  My point --

15        THE COURT:  And in the course of making his

16  escape, he wound up killing someone.

17        MR. DENNEHY:  Correct.

18        THE COURT:  That I could understand.  I am

19  having trouble with the concept --

20        MR. DENNEHY:  Well the whole --

21        THE COURT:  -- that in this particular case,

22  that the -- he came out shooting to prevent the

23  undercover police officers from taking the gun from him.

24  It doesn't seem -- I mean I think Judge Gleeson is a

25  wonderful judge.  I have the utmost respect for him but I

Transcription Plus II      Rosalie Lombardi

14

**Proceedings**

1   am just trying to wrap my head around the notion that a

2   rational juror could conclude that these people came out

3   essentially shooting to prevent the cops from -- the

4   undercover police officers from getting the gun.  It

5   doesn't -- it just like to me doesn't make any sense.

6            MR. DENNEHY:  It's a bit awkward but again, in

7   light of the -- whether the trying -- in light of the

8   deferential standard applicable to habeas petitions and

9   in light of the way New York courts have consistently

10  interpreted this in furtherance of language to not

11  strictly mean that the assault or the murder has to

12  actually further the commission of the underlying felony.

13  It wasn't unreasonable for the Appellate Division to

14  reject this claim.

15           THE COURT:  Well I mean that's one thing when

16  they're trying to get away, I could understand that.

17           MR. DENNEHY:  But there's --

18           THE COURT:  But I don't -- I just find it --

19  well tell me, the Jackson v. Virginia standard is the one

20  that I apply or do I ask whether the New York Court of

21  Appeals or whichever was the last court, the Appellate

22  Division here --

23           MR. DENNEHY:  It's the Jackson v. Virginia

24  standard.

25           THE COURT:  Yes.  So it's not a question of

15

**Proceedings**

1   deference.  That's the standard that applies in a federal

2   case, as well.  Do I -- what I was saying is do I ask the

3   question whether they unreasonably applied <u>Jackson v.</u>

4   <u>Virginia</u> or is it just simply the <u>Jackson v. Virginia</u>

5   standard?

6           MR. DENNEHY:  Uh-huh.

7           THE COURT:  And my understanding is that it's

8   the <u>Jackson v. Virginia</u> standard.  So I am not -- tell me

9   if I am wrong.  I mean --

10          MR. DENNEHY:  That's my understanding, as well,

11  Judge.

12          THE COURT:  So that we're dealing with -- and

13  we're not dealing with that -- the deference in -- at

14  least with the sufficiency of the evidence test, it's the

15  <u>Jackson v. Virginia</u> test which is the traditional due

16  process test.

17          MR. DENNEHY:  Right.  And I believe --

18          THE COURT:  Whether any -- and your argument is

19  that a rational juror could have concluded that they came

20  out shooting to prevent the police from taking the gun

21  that they were shooting them with?

22          MR. DENNEHY:  Well that was certainly part of

23  it.  I mean it was reasonable to assume that in a

24  purported gun sale, that the purchase of the guns would

25  be people familiar with guns and would possibly have

Transcription Plus II        Rosalie Lombardi

16

**Proceedings**

1    guns.

2         THE COURT:  Yes, I agree with that but they

3    were shooting at them, not to prevent the other guys from

4    taking the guns from them.  I mean I just can't wrap my

5    head around that concept.

6         MR. DENNEHY:  It was part of the gun

7    possession, that they wanted to maintain possessing the

8    guns and then you --

9         THE COURT:  What guns?

10         MR. DENNEHY:  -- could you then --

11         THE COURT:  The ones that they had in their

12    hand or the non-existent guns?

13         MR. DENNEHY:  No, the ones they had in their

14    hands.  And they knew that the people that they wanted to

15    rob might have been armed, they would fire the guns at

16    them in an effort to disarm them or disable them so that

17    they could commit the robbery.  But not only does it --

18         THE COURT:  Yes, but you see --

19         MR. DENNEHY:  But not --

20         THE COURT:  That would be easy if that's what

21    the Judge charged here.

22         MR. DENNEHY:  Admittedly it more logically

23    supports a finding that it furthered the robbery.

24         THE COURT:  They intended to rob him and that's

25    what they -- you know, they played out the scenario to

**Proceedings**

1  the point where these copes -- undercover police officers

2  were not going to give him money unless they saw guns, so

3  they came out and they started shooting because they were

4  going to take money from them.  I mean it's just --

5        MR. DENNEHY:  Just because it furthers the

6  robbery doesn't mean it can't concurrently also further

7  the weapons possession.  It could serve dual aims in the

8  firing of the guns.  It could complete the crime of

9  weapon possession and it could be intended to also

10  prevent the police from taking the weapons.

11        THE COURT:  What's the status of this Cherry

12  case that Judge Gleeson decided?

13        MR. DENNEHY:  I believe --

14        THE COURT:  Is there -- did it go up?  I didn't

15  notice whether he granted the certificate or not.

16        MR. DENNEHY:  No, he didn't grant a certificate

17  in this case.  I don't know.  I could follow-up with the

18  Court and inform the Court about the status.

19            (Court and clerk confer.)

20        THE COURT:  We'll find out the answer in a

21  second.

22        MR. DENNEHY:  Okay.

23        THE COURT:  Refresh my recollection.  Am I to

24  remember now -- did the Appellate Division say anything

25  more than the usual, the evidence was sufficient and they

18

### Proceedings

1  find the claim to be without merit?

2       MR. DENNEHY:  I don't think they did but let me

3  look and check.

4       MR. LANDAU:  No, it was boilerplate -- it was

5  just boilerplate.  Evidence was legally sufficient.  The

6  issue was preserved but the evidence is legally

7  sufficient and it's not against the weight of the

8  evidence.

9       THE COURT:  Well I don't deal with the weight

10 of the evidence.

11      MR. LANDAU:  Right, I understand that.

12      THE COURT:  And is there any case other than

13 Judge Gleeson's -- I mean any New York State case that,

14 you know, other than these meaningless, the evidence is

15 sufficient discusses this theory of yours?  That --

16      MR. DENNEHY:  There's a case that my opponent

17 cites that talks about CPW and legal sufficiency and

18 assault -- so there's the CPW count and the assault one

19 count and the in furtherance language in the assault

20 count and the sufficiency of it. But I think it's rather

21 conclusory and doesn't go into details.

22      MR. LANDAU:  Yes, I think it's Williams (ph.),

23 I think is the name of the case.

24      MR. DENNEHY:  Right.

25      MR. LANDAU:  255 AD 2d. I was not able to find

19

**Proceedings**

1    any other case that had substantially similar facts and

2    from the Williams case, you can't really tell what the

3    facts are.  I would state that I think that the New York

4    Court of Appeals has somewhat undermined the theory on

5    which the People are relying to sustain this conviction,

6    the People v. Cahill (ph.).  Cahill cited a couple of out

7    of state cases.  One of the cases was a case -- was it in

8    -- I think it was Williams -- I'm sorry Parker v. The

9    State in Arkansas where the defendant was charged with

10   felony murder for burglarizing a home in order to kill

11   its occupant.  The charge of the in furtherance language

12   of the capital felony statute wasn't satisfied where in

13   that case because the homicide didn't further the

14   burglary, the burglary furthered the homicide.

15          It was kind of a bootstrapping case, something

16   similar to I think what the People's or at least one of

17   the People's theories is here.  This is kind of a

18   bootstrapping to argue that --

19          THE COURT:  I'm sorry.  This is complicated so

20   repeat what you said.

21          MR. LANDAU:  Okay.  What I was saying was in

22   People v. Cahill, the New York Court of Appeals I submit

23   at least somewhat undermined the theory on which the

24   People are relying.  That's not a weapons possession and

25   felony assault case but Cahill cited with approval an out

**Proceedings**

1   of state case, <u>Parker v. the State</u> in which the

2   prosecution tried to rely on the burglary as to -- excuse

3   me --

4           THE COURT:  They wanted to enter the house --

5           MR. LANDAU:  Well, yes, they want -- they

6   burglarized the home in order to kill an occupant.

7           THE COURT:  Right.

8           MR. LANDAU:  The homicide didn't further the

9   burglary.  The burglary furthered the homicide but the

10  People were arguing the opposite.  And as I said, in

11  Cahill, the Cahill court cited that case with approval

12  and that's sort of a bootstrapping-type argument that was

13  made in Parker which is I think at least somewhat similar

14  to the bootstrapping argument that the People are making

15  here that somehow the shooting at Officer Marquez

16  furthered the possession of the gun that was in Cherry's

17  hand or one or the other defendant's hands since we're

18  not completely clear on, you know, which -- which

19  shooting actually --

20          THE COURT:  I wouldn't have any problem -- I

21  mean I understand your argument on the robbery but I

22  wouldn't -- I think the evidence was -- if this charge

23  here had been that the gun was being possessed for the

24  purpose of facilitating the robberies, it would be an

25  open and shut case.

**Proceedings**

1       MR. LANDAU:  I have no --

2       THE COURT:  I mean I think he knew that they

3   planned -- I think a jury could conclude, let me put it

4   this way, that they planned to -- that they could plan to

5   carry out a scheme to rob these people -- to get -- if

6   they could have gotten the money without shooting them,

7   they would have gotten the money -- they would have taken

8   it without shooting them but in the end, they planned to

9   rip them off and use violence in the process.

10       But the problem is the way this Judge -- it's

11   not inevitable from the way the crime was indicted that

12   it had to be submitted to the jury in this way.

13       MR. DENNEHY:  Well I would just reiterate

14   though that the in furtherance of language is not to be

15   taken literally.  It's -- there's a line of cases --

16   there's two of them that I am aware of with arson cases

17   where the defendant lights a fire, flees the scene,

18   firefighters come, firefighter perishes in the fire,

19   defendants caught and indicted and convicted a felony

20   murder.  That's an instance in which the death clearly

21   had little to no relationship whatsoever to the arson.

22   Of course the firefighter died as a result of a arson.

23   There was causation there, if you will.

24       THE COURT:  All right.  So let's assume, as a

25   result -- and I mean somehow that doesn't trouble me.  I

**Proceedings**

1   mean one of the reasons you don't want people committing

2   arson is because somebody could get killed in the fire,

3   whether it's a fire person or somebody in the house.

4           MR. DENNEHY:  But my point is, is that it's not

5   -- it doesn't further the crime of arson.  That's why

6   that -- that language is interpreted in a very loose way.

7           THE COURT:  Let's assume it is interpreted in a

8   loose way.  It's still -- to say that it's being given a

9   liberal interpretation doesn't mean that you -- that it -

10  - that you carry it to what seems to me to be somewhat

11  illogical extreme here.

12          MR. DENNEHY:  Well I think with the liberal

13  interpretation, I think there are sufficient facts in

14  this case to conclude that the gun -- that the assault

15  was in furtherance of the gun possession.

16          THE COURT:  (inaudible) Cherry.

17          MR. LANDAU:  Right.

18          THE COURT:  I think that's the last --

19          MR. LANDAU:  Right.

20          THE COURT:  I think that's the last

21  (inaudible).

22          MR. LANDAU:  I don't --

23          THE COURT:  It may be that the --

24          THE CLERK:  You need to speak up, Judge.

25          THE COURT:  It may be the last entry that the

**Proceedings**

1  record came back but I mean that's the last significant

2  entry on the docket sheet.

3          MR. LANDAU:  As a -- maybe perhaps a minor

4  point on Cherry, that's -- Judge Gleeson's decision

5  relating to the merits of the claim is really dicta.

6  There was -- that issue, as far as Cherry goes was

7  unpreserved.  There was a procedural default and there

8  was no cause.  So it's really --

9          THE COURT:  I don't know but he addressed the

10  merits.

11          MR. LANDAU:  Well he did address the merits.

12          THE COURT:  He did.

13          MR. LANDAU:  I am just saying that because

14  there was --

15          THE COURT:  Oh, I see what you mean because --

16          MR. LANDAU:  Because there was no cause it's

17  sort of --

18          THE COURT:  Well I understand what you're

19  saying because even though he addressed the merits, there

20  was a procedural default and that could provide the basis

21  for the Court of Appeals not granting a certificate.  I

22  assume that's what you're saying.

23          MR. LANDAU:  Well it's part of it.  I am just

24  saying that his addressing the merits wasn't necessary in

25  this case because of the lack of procedural defaults.

**Proceedings**

1          THE COURT:  I know but he addressed it and he's

2     of, in my view, a brilliant and thoughtful judge.  I mean

3     I think he's one of the starts in the court.  It's the

4     only thing that gives me pause here.  Otherwise this

5     thing doesn't make a hell of a lot of sense to me.

6          MR. LANDAU:  Also, we don't know -- we don't

7     know, at least not from the papers I have seen so far,

8     whether Cherry made the same arguments that we're making

9     here regarding Malagon (ph.).

10          THE COURT:  Regarding what?

11          MR. LANDAU:  Malagon.  The -- regarding the

12     charge that had to be in furtherance of the weapon

13     possession.

14          THE COURT:  Oh, he did.

15          MR. LANDAU:  And specifically --

16          THE COURT:  I mean I think he basically --

17          MR. LANDAU:  Why it is --

18          THE COURT:  He says at first glance it may seem

19     artificial to describe the assault as in furtherance of

20     the group's possession.  It's more natural to say the act

21     was in furtherance of their main aim which was to rob

22     Robert and Marquez of the money, that as gun buyers, the

23     undercover detectives were assuming to be carrying.

24          And then he goes on to say nevertheless, this

25     is plain, there was sufficient evidence to find the

25

**Proceedings**

1   requisite nexus between the underlying felony and the

2   serious injury inflicted on Marquez.  I don't want to

3   read the whole thing but it says in so doing, Cherry and

4   his accomplices were committing the crimes of criminal

5   possession of a weapon in the second and third degree and

6   opening fire on the detectives, Cherry and his

7   accomplices while also furthering their primary aim of

8   committing a robbery simultaneously sought to further

9   their criminal possession of the weapons.  The assault

10  was intended to prevent the detectives who might have

11  been and in fact were armed from taking possession of the

12  weapons during the robbery.

13           MR. LANDAU:  Right.

14           THE COURT:  I mean that's the -- I mean that's

15  exactly the argument that the District Attorney is making

16  here.

17           MR. LANDAU:  Maybe I am parsing --

18           THE COURT:  I mean, I don't -- maybe I --

19           MR. LANDAU:  I may be parsing a little bit,

20  your Honor, but our argument has been that not only did

21  the people have to prove that it was -- that the assault

22  was in furtherance of generally criminal possession of a

23  weapon but specifically, criminal possession of the 22

24  caliber weapon because the petitioner was acquitted of

25  criminal possession of the nine millimeter weapon.  I

**Proceedings**

1   don't know whether Cherry --

2        THE COURT:  I don't know if -- I don't

3   understand the significance of that.  First of all, you

4   know, it may be inconsistent verdicts in state -- you

5   know, that -- you know, the fact that the verdicts may be

6   inconsistent is immaterial in federal court.  But suppose

7   they did, I mean what's the difference between the nine

8   millimeter --

9        MR. LANDAU:  Well --

10       THE COURT:  What is the relevance between the

11   nine and the 22 --

12       MR. LANDAU:  The nine millimeter guns were the

13   ones that were supposedly the subject of the gun sale.

14       THE COURT:  Right.

15       MR. LANDAU:  The 22 caliber wasn't mentioned as

16   being the subject of a gun sale.

17       THE COURT:  Right.  So the theory would have to

18   be that this shooting of the detective was done to retain

19   the 22 that Cherry and the other co-defendants had to

20   shoot the detectives or to retain the nine millimeter

21   guns.

22       THE COURT:  That's not -- I don't understand

23   that that's the theory.  The theory is in opening fire on

24   the detectives, Cherry and his accomplices were

25   furthering their primary aim of committing a robbery

### Proceedings

1  simultaneously sought to further their criminal

2  possession of those weapons.  The assault was intended to

3  prevent the detectives from taking possession of the

4  weapons during the robbery.  That's what, as I understand

5  the theory, that it was -- that's what the submission was

6  to the jury.

7           MR. DENNEHY:  That's right, your Honor,

8  although it wasn't as specific as that.  The Court merely

9  read the statute.

10          THE COURT:  So how do we know they didn't find

11 that the robbery was the underlying crime?

12          MR. DENNEHY:  Because that wasn't what was

13 charged.

14          MR. LANDAU:  The Court did charge that the

15 underlying felony had to be criminal possession of a

16 weapon.

17          MR. DENNEHY:  But didn't -- what I was speaking

18 to as -- was the part of the decision that talked about

19 their using the weapons in an effort --

20          THE COURT:  Please stop for one second.  I --

21 this is urgent, otherwise I would never do this.

22          (Off the record)

23          THE COURT:  I'm sorry, go ahead.

24          MR. DENNEHY:  That's okay.  I was simply saying

25 that the Court didn't mention to the jury about a finding

28

**Proceedings**

1   that the weapon possession, that the guns were being used

2   and fired at in an effort to retain them to complete the

3   weapon possession.  That wasn't part of the Court's

4   charge.

5          THE COURT:  So what did he say to them?

6          MR. DENNEHY:  The Court said that the -- you

7   know, it charged the language of first degree assault and

8   said that in order to find the defendant of the first

9   degree assault, he went through the elements of the crime

10  and then he mentioned that the underlying felony

11  associated with the first degree assault was the weapon

12  possession.

13         THE COURT:  So that was basically --

14         MR. DENNEHY:  Yes.

15         THE COURT:  I mean that's basically it.

16         MR. DENNEHY:  Admittedly, just in -- no further

17  detail was given as to how the jury should evaluate the

18  evidence.

19         THE COURT:  So he never instructed them on the

20  meaning of in furtherance.

21         MR. DENNEHY:  Don't know the answer to that;

22  the level of detail that was given on the in furtherance

23  language.  I did not bring the transcript.

24         MR. LANDAU:  I believe I actually have the

25  transcript here.

**Proceedings**

1          THE COURT:  We have it upstairs if you don't

2    have it here.

3          MR. LANDAU:  I'm pretty sure I do.  I tried to

4    take the summations and the charge.

5          MR. DENNEHY:  I actually have -- the charge is

6    summarized in the defense brief in the Appellate

7    Division.  Okay.  The Court charged the standard

8    language.  Read the first degree assault statute, said

9    but in the course of and in furtherance of the commission

10   of a felony or immediate flight therefrom, he or another

11   participant if there be any causes serious physical

12   injury to any other -- I'm sorry, to a person other than

13   one of the participants.

14          The Court added, "When during the actual

15   commission of the felony, the criminal possession of a

16   weapon or in the immediate flight therefrom, one of the

17   participants causes serious physical injury to a third

18   person, the one who caused the serious physical injury

19   and all others as well are guilty of assault in the first

20   degree.  Under the law, it does not matter that the act

21   which caused such serious physical injury was committed

22   unintentionally or accidentally rather than any intention

23   to cause serious physical injury.  The participants are

24   guilty of assault in the first degree as though each had

25   committed the act which caused the serious physical

30

### Proceedings

1   injury and as though each had done so intentionally."

2        So that's where the reference to the weapon

3   possession comes in.  He said "When during the actual

4   commission of the felony, the criminal possession of a

5   weapon or in the immediate flight therefrom."  So it's

6   there that the underlying felony is identified as the

7   weapon possession.

8        THE COURT:  And could he have identified it as

9   a robbery?  I mean was he precluded from the wording of

10  the indictment or did he just pick this out of the air?

11       MR. DENNEHY:  He was not precluded from

12  charging it as a robbery.

13       MR. LANDAU:  The indictment was in general.  I

14  don't believe it identified a particular underlying

15  felony but the Court's charge did.

16       THE COURT:  Not that it matters, but we don't

17  even know what the grand jury -- what basis the grand

18  jury indicted here.

19       MR. DENNEHY:  I viewed the indictment and there

20  was no robbery charges or attempted robbery charges.  So

21  apparently those charges weren't submitted to the grand

22  jury.  There was more -- there were attempted murder

23  charges.  There were assault charges.

24       THE COURT:  No, no.

25       MR. DENNEHY:  Right.

**Proceedings**

1          THE COURT:  All you know is what is in here.

2    You don't know what theoretically the grand jury might

3    have not indicted because they didn't want to indict but

4    we don't know what theory -- I see what you're saying,

5    because they didn't indict on the robbery charge, then

6    they must have been charged on this by the prosecutor.

7          MR. DENNEHY:  That's the presumption.

8          THE COURT:  And if I disagree with you, I grant

9    the writ as to the whole thing?.

10          MR. DENNEHY:  Is that a question?

11          THE COURT:  Yes, if I disagree with you.

12          MR. DENNEHY:  Oh, I see.  In other words, does

13    the weapon possession survive?

14          THE COURT:  Well the weapons possession --

15    which count -- would they all go down the drain?

16          MR. DENNEHY:  Well he was convicted of one

17    count of second degree weapons possession and the main

18    count of first degree assault.

19          THE COURT:  The second degree, the weapons

20    possession would also go down, I mean, the way I

21    understand it.  What is second degree weapons possession?

22          MR. DENNEHY:  It's when one uses or attempts to

23    use a weapon unlawfully.  So it involves the use, the

24    actual use or attempted use of the weapon.  And I believe

25    under the acting in concert theory, that the people

### Proceedings

1   presented in this case, there was more than sufficient

2   evidence to conclude that this defendant acted in concert

3   with his accomplices in the firing of the weapon.  So

4   that charge would stand.

5          THE COURT:  And what count is that?

6          MR. DENNEHY:  That's criminal possession of a

7   weapon in the second degree.  It's Criminal Procedure Law

8   -- I'm sorry, Penal Law Section 265.03(2).

9          THE COURT:  And what did he get on that count?

10         MR. DENNEHY:  Five years.

11         THE COURT:  Which he served.

12         MR. DENNEHY:  Correct.  He's doing 25 on the

13   first degree assault count.

14         THE COURT:  And could you think of a reason why

15   it wasn't in furtherance of a robbery, wasn't charge as

16   the basis for the predicate?  Why would somebody choose

17   such a -- even with -- or how did Judge Gleeson describe

18   it?

19         MR. DENNEHY:  Is your question why the Judge

20   didn't include that in his jury instructions?

21         THE COURT:  Yes.

22         MR. DENNEHY:  Or why it wasn't charged in the

23   accusatory instrument?

24         THE COURT:  Well I don't -- why did the Judge

25   do it that way?

33

**Proceedings**

1          MR. DENNEHY:  Maybe because of the mis --

2          THE COURT:  Even Judge Gleeson says it's

3     artificial, describe it as assault in furtherance of a

4     group's weapon's possessions.

5          MR. DENNEHY:  Admittedly --

6          THE COURT:  It just seems to me to be --

7          MR. DENNEHY:  Admittedly very awkward, although

8     the People's submission is that's legal.

9          THE COURT:  Well did the district attorney ask

10    him to charge it this way?

11         MR. DENNEHY:  No, I don't think there was

12    colloquy about it, if memory serves.

13         THE COURT:  WAs there any objection to the

14    charge?

15         MR. LANDAU:  Not that I am aware of.  The

16    prosecutor certainly didn't request that it be charged in

17    furtherance of a robbery.  I can't speak as to the

18    rational for not doing it.  I don't believe there was a

19    robbery charge in the indictment itself, so maybe that

20    had something to do with it.  But anything else I would

21    say would be speculation.

22         THE COURT:  What's the cite to <u>Cahill</u>, by the

23    way, the case you --

24         MR. LANDAU:  2 NY 3d. 14. Do you need the New

25    York Supp. site?

Transcription Plus II        Rosalie Lombardi

34

**Proceedings**

1          THE COURT:  No.

2          MR. LANDAU:  Okay.  And I think the page --

3     it's a long case, so the pages on which that particular

4     point are located are 69 to 70.

5          THE COURT:  And the Judge never defined in

6     furtherance to the jury.

7          MR. DENNEHY:  I'm basing my reading of the

8     record on a brief which necessarily doesn't include all

9     of the language.  I don't want to make a representation

10    that there was no additional language.  Would it be

11    helpful to give you the page cite of where he talks about

12    the charge itself, the first degree robbery charge?

13         MR. LANDAU:  Yes.

14         MR. DENNEHY:  Okay.  That cite is 1123.

15         MR. LANDAU:  Yeah, it's 1123, goes through

16    1126.  The only thing that the Judge charged on page 1126

17    relating to the in furtherance language was that the jury

18    could consider factors such as the time between the

19    commission of the crime which was criminal possession of

20    a weapon and the infliction of the injury, the distance

21    between the location of the possession of the weapon and

22    the place at which the serious physical injury was

23    inflicted and all of the other evidence educed at the

24    trial.  That's the only elucidation the Judge gave on the

25    in furtherance language.

35

## Proceedings

1    THE COURT:  So I mean it seems to me what

2 you're arguing really is they came out with the intent to

3 commit a robbery.  They came out essentially shooting and

4 because arguably that could have the effect of -- I mean

5 I can't even articulate this theory that it would have

6 the effect of preventing the cops from taking the guns

7 away from them, that that satisfied the in furtherance

8 of.

9    MR. DENNEHY:  Well the argument's twofold.

10 That's one part of it.  It would have the effect of

11 preventing the cops -- that it would have the effect of

12 preventing the cops from taking the guns away from them,

13 thus enabling them to maintain possession and to continue

14 the crime of criminal possession of a weapon in the

15 second degree.

16    The first part is that when they came out

17 firing their guns, they're completing -- they're in the

18 midst of completing the criminal possession of a weapon

19 in the second degree by actually firing their weapons at

20 the officers.  During the course of that, the bullets are

21 discharged from their weapons and strike the officer in

22 the hand.  therefore, the temporal proximity and the --

23    THE COURT:  I know about that but the statute

24 requires in furtherance.

25    MR. DENNEHY:  Right.  But it's the People's

36

### Proceedings

1  position that the in furtherance of language is not meant

2  to be read literally.  That the act is not specifically

3  meant to further the crime.

4          THE COURT:  How would -- give me your

5  definition of in furtherance.

6          MR. DENNEHY:  My definition would be --

7          THE COURT:  No, if you want you don't have to

8  give it to me now.  I don't want to -- if you want to

9  think about it and give me a letter afterwards, that's

10  okay, too.

11          MR. DENNEHY:  I would prefer that, so I would

12  rather articulate it in a precise way --

13          THE COURT:  Okay.

14          MR. DENNEHY:  -- rather than just firing off

15  the cuff here.

16          THE COURT:  Why don't you do that?

17          MR. DENNEHY:  Thank you.

18          THE COURT:  And I will reserve decision.

19          MR. LANDAU:  Judge, if I might, I would just

20  like to hand up a decision I discussed with counsel.  I

21  gave him a copy.  It relates more to the other point

22  about the knowledge as to the purpose of the transaction

23  and whether the --

24          THE COURT:  Look, I think he knew -- I think a

25  jury could find, let me put it that way, that there was

37

**Proceedings**

1  sufficient evidence that he knew. particularly -- I mean

2  even without the disbelief of his testimony but

3  particularly given the jury's ability in a case in which

4  the evidence was already sufficient in my view, the jury

5  could take into account their disbelief of his denial.

6  There's a line of cases that holds that, federal cases

7  anyway, that holds -- there's a NInth Circuit case which

8  is a -- I have in a bench memo that was prepared but I

9  will give you the NInth Circuit case but it's really --

10 believe me, there is Second Circuit law that holds it.

11 It's US v. Selby in 557 F.3d 968, 976.  It's a 9 Cir.

12 (2009).  But it's -- there are Second Circuit cases.  I

13 just can't remember off the top of my head.  There's one

14 by Judge Frank and --

15          I will reserve decision.

16          MR. DENNEHY:  Thank you, your Honor.

17          MR. LANDAU:  Thank you, your Honor.

18          THE CLERK:  Thank you, counsel.

19              (Matter concluded)

20                  -o0o-

21

22

23

24

25

38

# C  E  R  T  I  F  I  C  A  T  E

I, ROSALIE LOMBARDI, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **20th** day of **April** , 2010.

*Rosalie Lombardi*
Rosalie Lombardi
Transcription Plus II

Transcription Plus II          Rosalie Lombardi