UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
KEVIN LANGSTON,

                        Plaintiff,

        - against -

JOSEPH SMITH,

                        Defendant.
------------------------------------------------------------------------X

**CORRECTED MEMORANDUM & ORDER**

No. 07-cv-2630 (ERK)

KORMAN, *J.*:

      Kevin Langston was found guilty, after a jury trial in the Supreme Court of the State of New York, Kings County, of first-degree felony assault, N.Y. Penal Law § 120.10(4), and second-degree criminal possession of a weapon, N.Y. Penal Law § 265.03(2). On October 24, 2003, he was sentenced to concurrent prison terms of twenty-five and five years, respectively, and is currently incarcerated at Shawangunk Correctional Facility in Wallkill, New York. Langston appealed his convictions to the Appellate Division, Second Department, claiming that the evidence of his guilt was legally insufficient to prove that he criminally possessed a weapon or that the assault was in furtherance of the possession. (Appellant's Br., 30-41.) On January 17, 2006, the Appellate Division held that the evidence presented was legally sufficient on both counts. See People v. Langston, 806 N.Y.S.2d 886 (2006). Langston unsuccessfully sought leave to appeal to the Court of Appeals. See People v. Langston, 816 N.Y.S.2d 755 (2006). This petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 followed. The case was reassigned to me on February 1, 2010.

# I. BACKGROUND

The events that led to Langston's arrest, trial, and conviction stem from a New York Police Department ("NYPD") gun buy-and-bust gone awry. On the evening of May 22, 2002, NYPD undercover detectives John Robert and Arthur Marquez drove to Junior's restaurant in downtown Brooklyn, where they met with Edward Moultrie and arranged to buy four 9-millimeter handguns for $3,000. Moultrie introduced the detectives to Langston, (Tr. Transcript, 513, 687-88), who informed them that the guns were currently being held at 301 Sutter Avenue in Brooklyn, (id. at 973).

All four men drove to the directed address in the detectives' car, at which point Langston said: "Okay, give me the money, I'll be right back." (Id. at 552.) Detective Robert replied: "Go get the guns, bring them down here, and after we look at them, I'll give you the money." (Id. at 553.) Langston reluctantly entered the building, leaving the other three men outside. Upon returning to the vehicle, Langston again demanded the money for the guns upfront. (Id. at 974.) The detectives, however, again refused to turn over any money until the firearms were produced. (Id. at 552-54, 974.) Langston then demanded reimbursement for the cab fare he paid in coming from Manhattan to arrange the exchange. (Id. at 557.) The detectives also refused this request, and Langston reentered the building for several minutes. (Id. at 559.) He returned with a proposal that the gun sale occur within the building's sixth floor hallway, to which the detectives agreed. (Id.) Once inside the building, the detectives met several people in the lobby, including Gamel Cherry, who indicated that he would be helping to set up the exchange. (Id. at 560, 975, 998-99.)

At Langston's request, the four men took an elevator up to the sixth floor. (Id. at 560, 976-77.) On the way up, the elevator stopped at the fifth floor, and the doors opened to reveal

two men, one of whom was named Skyler Brownlee, standing in the hallway waiting for the elevator to arrive. Langston testified at trial that he never acknowledged Brownlee, (id. at 977-78), but the detectives testified that there was a greeting of sorts between the men, (id. at 562, 712-13).

Brownlee and the other man did not get on the elevator, which then proceeded to the sixth floor, where Langston yet again demanded money for the guns. (Id. at 562, 713-14, 978.) The detectives again refused, and Langston left the hallway to see if he could arrange the exchange. (Id. at 564.) A few minutes later, he returned to the sixth floor hallway and told the detectives that "they don't want to do it like that." (Id. at 566, 715-16, 740-41.) Moments later, Cherry emerged from the stairwell and stated: "I don't do business like that. Just give me the money upfront and I'll get the guns." (Id. at 565-66, 600, 603, 717, 741-42.) This now-familiar argument continued for some time until Cherry requested to see identification from the detectives, and Detective Marquez complied. (Id. at 569-70, 719, 980.) The detectives testified at trial that Cherry then left the hallway, saying: "Okay, we're going to do this, you're going to get what you came here for." (Id. at 571, 604, 720, 742.) Langston testified that Cherry left saying nothing. (Id. at 981.)

Approximately five minutes later, Cherry re-entered the hallway with a gun, flanked by Skyler Brownlee and Ralph Wyman, who were also armed. (Id. at 574, 721-23.) The three men, apparently no longer interested in the sale of guns, began shooting at the detectives, who returned fire. (Id. at 575-76, 723-25, 982-83.) Although the detectives managed to escape from the building, Detective Marquez sustained a gunshot wound to the hand. (Id. at 576-78, 725-27.) Langston was shot in the arm and buttocks, and Moultrie was shot in the back and face, and left

3

paralyzed as a result. (Id. at 983.) During the incident, neither Langston nor Moultrie physically possessed a gun. (Id. at 609, 754, 764.)

Following the shootout, Langston fled the building and was later apprehended at Vansideren Subway Station, where he told police that he had been the victim of a robbery. (Id. at 667, 988.) Up until the time that gunfire erupted, the botched gun deal was being electronically monitored by NYPD detectives Dante Cavallo and Robert Delaney through the use of a wire. (Id. at 512.) Once the firing ceased, Detective Cavallo entered the sixth floor of the building and found Moultrie lying on the floor near the elevator. (Id. at 518, 860.) He discovered a 9-millimeter gun and shell casings on the floor, along with a discharged .22-caliber bullet shell and live cartridge. (Id. at 518-19, 778, 861.) Another NYPD detective, Samuel Guilford, testified at trial that no usable fingerprints were found on the gun, (id. at 779), and the .22-caliber pistol was never recovered.

Langston gave written and videotaped statements to the NYPD following the incident. (Id. at 997.) In the videotaped statement, he contended that he met Moultrie in Manhattan and agreed to help him sell guns to the undercover detectives. (Id. at 1017-18.) When asked whether anyone was waiting for the elevator when it arrived on the fifth floor at 301 Sutter Avenue, Langston initially claimed he didn't see anyone, though he later admitted in court that he had lied. (Id. at 1011-12.) Langston also explained that he lied in his statement when he said that he did not know Cherry. (Id. at 997.) Moreover, contrary to his videotaped statement, he claimed at trial that he had never provided the actual directions to 301 Sutter Avenue. (Id. at 1020.) Langston maintained that he lied during his videotaped statement because NYPD detectives threatened him with life imprisonment if he did not say what they wanted him to say. (Id. at 1012, 1015, 1031.)

4

## II. DISCUSSION

Langston argues that the evidence presented at his trial was legally insufficient to support both his weapon possession conviction (Count Two) and assault conviction (Count One). (Pet'r's Br., 21-22.) In order to prevail under a sufficiency of the evidence argument in a habeas proceeding, the petitioner "bears a very heavy burden." Einaugler v. Supreme Court, 109 F.3d 836, 840 (2d Cir. 1997). In assessing such cases, the reviewing court must decide whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). "Criminal convictions may issue only upon proof beyond a reasonable doubt of every element of the charged offense." Justice v. Hoke, 45 F.3d 33, 34 (2d Cir. 1995) (citing In re Winship, 397 U.S. 358, 364 (1970)) (emphasis added). When it considers the sufficiency of the evidence of a state conviction, "[a] federal court must look to the state law to determine the elements of the crime." Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 811 (2d Cir. 2000) (quoting Quartararo v. Hanslmaier, 186 F.3d 91, 97 (2d Cir. 1999)).

In Jackson v. Virginia, the Supreme Court explained the importance of preserving the role and responsibility of the trier of fact to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." 443 U.S. at 307. The ultimate decision of the factfinder is paramount and "is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution." Id. (emphasis in original). In sum, the weight and credibility of the evidence are issues for the jury to resolve and the reviewing court must "defer to the jury's assessments of both of these issues." Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996). "The ultimate

question is not whether <u>we</u> <u>believe</u> the evidence adduced at trial established defendant's guilt beyond a reasonable doubt, but whether <u>any rational trier of fact could so find</u>." <u>United States v. Payton</u>, 159 F.3d 49, 56 (2d Cir. 1998) (emphasis in original).

A. Criminal Possession (Count Two)

Langston first claims that the evidence at trial was insufficient to prove his knowledge or possession of the guns used by Cherry, Wyman, and Brownlee during their assault of the undercover detectives. He argues that he was never in possession of the weapons, did not exercise dominion and control over them, and had no prior knowledge that they would be used against the detectives. (Pet'r's Br., 31-33.) Consequently, he claims that he could not have criminally possessed a weapon within the meaning of N.Y. Penal Law § 265.03(2).

Because Langston was charged with acting in concert with Cherry, Moultrie, Wyman, and Brownlee, however, the District Attorney was not required to prove that Langston physically possessed any gun used in the assault. (Tr. Transcript, 1121-22); <u>see</u> <u>People v. Bosque</u>, 433 N.Y.S.2d 658, 659 (4th Dep't 1980). Thus, although he did not commit the actual act of criminal possession himself, Langston was found responsible for the conduct of Cherry, Wyman, and Brownlee "in pursuance of a common criminal design and with common criminal intent." (Tr. Transcript 1121-22.); <u>see</u> <u>People v. Livingston</u>, 567 N.Y.S.2d 313, 314 (2d Dep't 1991). A review of the trial record shows ample evidence from which a rational jury could have reached this result.

The jury heard the following evidence at trial: 1) Langston and Moultrie arranged to sell guns to the undercover detectives, and traveled together to 301 Sutter Avenue, which was to serve as the location of the sale; 2) Langston greeted Cherry in the lobby of the building, and

6

Cherry planned to participate in the exchange; 3) Langston greeted Brownlee when the elevator briefly stopped on the fifth floor; 4) Langston demanded money from the detectives in exchange for guns; 5) when the detectives failed to comply, repeated requests were made by Langston and then by Cherry; 6) Cherry left the sixth floor of the building after saying to the detectives "you're going to get what you came here for"; and 7) moments later, Cherry, Wyman, and Brownlee returned and opened fire on the detectives. Based on these facts, and because Langston refused to hand over (or even show) the detectives any firearms prior to payment, a rational jury could have found that Langston, Cherry, Moultrie, Wyman, and Brownlee shared a common criminal intent to bring the detectives to 301 Sutter Avenue to rob them. The jury could have inferred that the men shared the common intent to possess the weapons and use them against the detectives in the event that the "deal" did not go as planned. In short, it was reasonable for the jury to conclude that Langston knew his cohorts were illegally armed and thus shared their intent in this regard. See United States v. MacPherson, 424 F.3d 183, 190 (2d Cir. 2005) (demonstrating how the totality of circumstantial evidence may permit a jury to find beyond a reasonable doubt that the defendant engaged in his criminal act with the requisite knowledge and intent).

Although Langston testified that he did not intend to rob the detectives with the guns and had no prior knowledge that this would happen, (Trial Tr., 1007), and that he did not know Wyman or Brownlee prior to the incident, (id. at 1025), the "mere fact that a witness makes a statement . . . does not require an acceptance of such a statement as credible evidence," United States v. Lease, 1964 WL 12262 (S.D.N.Y. Mar 11, 1964) (quoting Breland v. United States, 323 F.2d 492, 496 (5th Cir. 1963)). On the contrary, based on its assessment of Langston's demeanor, combined with the background circumstances and other evidence casting doubt on his credibility, including his admission that he lied to the police regarding whether he knew Cherry

prior to the gun deal, the jury could have disbelieved Langston's testimony and "was entitled to conclude that [his] version of the events was false and thereby infer his guilt." United States v. Friedman, 998 F.2d 53, 57 (2d Cir. 1993) (citing United States v. Marchand, 564 F.2d 983, 985-86 (2d Cir. 1977)). Consequently, a rational trier of fact could have found that Langston shared in the intent to criminally possess the .22-caliber pistol used to assault the detectives.

B. Felony Assault (Count One)

I now turn to Langston's second argument—that the evidence at trial was constitutionally insufficient to establish that the first-degree felony assault was committed "in furtherance of" criminal possession of a weapon. (Pet'r's Br., 36.) Langston was convicted on this count after the jury found that, while acting in concert with others, he caused serious physical injury to another person "[i]n the course of and in furtherance of the commission or attempted commission of a felony or immediate flight therefrom." N.Y. Pen. Law § 120.10(4) (emphasis added). New York's offense of felony assault is analogous to its offense of felony murder, in that both statues create crimes of constructive malice, under which the intent necessary for an assault or murder conviction is inferred from the intent to commit the underlying felony. See N.Y. Pen. Law § 125.25(3); see also People v. Spivey, 81 N.Y.2d 356, 361 (1993); People v. Berzups, 49 N.Y.2d 417, 427 (1980).

Langston contends that the "in furtherance of" language found in New York's felony assault statute requires the assault to have been committed in order to advance or facilitate the underlying felony—in this case, criminal possession of a weapon. He further argues that to hold otherwise would be to read the critical "in furtherance of" language out of the statute entirely. Numerous New York cases suggest that, in the context of felony murder, "in furtherance of"

8

requires something more than death that is caused merely during the course of the underlying crime. See People v. Hernandez, 82 N.Y.2d 309, 317 (1993) ("New York law is clear that felony murder does not embrace any killing that is coincidental with the felony but instead is limited to those deaths caused by one of the felons in furtherance of their crime."); People v. Joyner, 26 N.Y.2d 106, 109-10 (1970) (to be convicted of felony murder, defendant must have murdered "for the purpose of" committing the underlying felony).

For example, in People v. Wood, 8 N.Y.2d 48, 51 (1960), the defendant and several accomplices engaged in a gun battle with police. While attempting to escape, the group exchanged shots with the officer and a bystander coming to his aid. The bystander shot and killed one of the defendant's accomplices, as well as another innocent bystander, and the defendant was charged with felony murder. The Court of Appeals affirmed the lower court's dismissal of the felony murder counts, holding that, although the deaths were the foreseeable consequence of the underlying assault, the defendant could not be held responsible. The Court of Appeals stated:

> Thus, a felony murder embraces not any . . . [murder] incidentally coincident with the felony . . . but only those committed by one of the criminals in the attempted execution of the unlawful end. Although the homicide itself need not be within the common design . . . the <u>act</u> which results in death must be in furtherance of the unlawful purpose . . . [t]he act . . . must be '. . . committed . . . in furtherance of a common object or purpose.'

Id. at 51-52 (emphasis in original).

Indeed, such an interpretation is consistent with the rule of statutory construction that all words contained in a statute be given effect to avoid rendering them superfluous. See Duncan v. Walker, 533 U.S. 167 (2001); United States v. Menasche, 348 U.S. 528, 538-39 (1955); see also Sanders v. Winship, 57 N.Y.2d 391, 396 (1982). Applying these holdings to the felony assault

9

context, which is analogous to felony murder and employs identical statutory language, an assault must be committed both during the course of, <u>and</u> in furtherance of, the underlying felony—to hold otherwise would be to render the "in furtherance of" language superfluous.[1]

Having concluded that felony assault under N.Y. Penal Law § 120.10(4) requires the assault to be committed in furtherance of the underlying felony, the critical question is what the phrase "in furtherance of" means. Langston's argument that "in furtherance of" can only mean to advance or facilitate is plainly inconsistent with a number of cases involving felony-murder convictions for the deaths of firefighters caused by arson. See, e.g., People v. Corey, 650 N.Y.S.2d 411 (3d Dep't 1996); People v. Zane, 543 N.Y.S.2d 777 (4th Dep't 1989). In Zane, the defendant was convicted for felony murder "for having caused the death of a fireman in the course of and in furtherance of the crime of arson," despite the fact that the firefighter died after the arson had been completed. 543 N.Y.S.2d at 778. In such a situation, "the fire-fighter's death obviously did not 'advance or facilitate' the arson." People v. Cahill, 2 N.Y.3d 14, 102 n.1 (2003) (Grafeo, *J.*, dissenting). Indeed, in another case where arson caused the death of a firefighter, a New York State Supreme Justice opined that, in the arson context, the "in furtherance of" language means nothing at all:

> What does the statutory phrase "in furtherance of such crime" mean within the context of a felony-murder indictment where arson is the predicate felony? How can we say that in furtherance of the crime of arson the defendant caused the death of Fireman Bub? With due deference to the drafters of the new Penal Law and to the Legislature, the phrase is meaningless within the context, of an arson-homicide. In all the other felonies death will most likely occur only during or after a direct encounter between the victim and the defendant . . . . But in the context of an arson case it is meaningless and at best surplusage. To the extent that to apply it to the facts of the instant case would require dismissal of the

---

[1] This interpretation is not undermined by People v. Slaughter, 78 N.Y.2d 485 (1991), and similar felony murder cases involving injuries or deaths that occur while the defendant is fleeing, because they implicate the "immediate flight therefrom" language of N.Y. Penal Law § 120.10(4), not the "in furtherance of" requirement.

10

> indictment an absurd result would be created, and no court should interpret statutory language to an absurd result . . . . I hold, therefore, that the requirement that the act causing death be in furtherance of the crime of arson is neither comprehensible nor applicable to the instant case.

People v. Lozano, 434 N.Y.S.2d 588, 590-91 (N.Y. Sup. Ct. 1980).

While the New York Court of Appeals does not appear to have sanctioned the holdings in the arson-felony murder cases, New York courts have suggested that, in contexts other than arson, the "in furtherance of" element requires there to be some "logical nexus" between the physical harm created and the predicate felony. For example, in People v. Lewis, 444 N.Y.S.2d 1003 (N.Y. Sup. Ct. 1981), a New York State Supreme Court Justice interpreted the New York Court of Appeals decision in People v. Wood, 8 N.Y.2d 48, 51 (1960), as holding that the physical harm must be logically related to the purpose of the predicate felony:

> This equation of 'in furtherance' with 'in aid of' or 'in advancement of' has the virtue of linguistic accuracy, but is at odds with both the history and purpose of the 'in furtherance' requirement. The phrase can best be understood as the third logical link in the triad which must be present to connect a felony with a consequent homicide. Just as 'in the course of' imposes a duration requirement, 'causes the death' a causation requirement, 'in furtherance' places a relation requirement between the felony and the homicide. More than the mere coincidence to time and place (People v. Wood, supra), the nexus must be one of logic or plan. Excluded are those deaths which are so far outside the ambit of the plan of the felony and its execution as to be unrelated to them.

Id. at 1006.

Here, the evidence clearly established that the assault on the detectives took place in furtherance of a robbery. Langston, however, was not charged with possession of a weapon in furtherance of robbery. Indeed, in charging Langston with felony assault, the prosecution relied upon criminal possession of a weapon as the predicate felony. Consequently, there must be

some nexus "of logic or plan" between the assault and the underlying criminal possession of the guns. The District Attorney argues that the purpose of the assault was to further the goal of criminally possessing the guns—in other words, Langston's accomplices appeared and opened fire in order to prevent the detectives from taking the weapons with which they were committing the assault. (District Attorney's letter dated April 20, 2004, at 4-5.) Such a scenario strains the bounds of imagination and simply could not be inferred from the evidence presented at trial. Indeed, the District Attorney's argument gets it exactly backwards—the criminal possession was committed in furtherance of the assault and attempted robbery, the assault was not committed in furtherance of the criminal possession of the weapons. Cf. People v. Cahill, 2 N.Y.3d at 70 (holding that, if the intent of a burglary is to commit murder, then it cannot be said that the murder was carried out "in furtherance of" the burglary, because the burglary "was merely a prerequisite to . . . committing the murder").

I note that my colleague, Judge Gleeson, recently addressed this same issue in the habeas petition of Gamel Cherry, Langston's co-defendant. While he concluded that Cherry's argument had been procedurally forfeited, he also addressed the merits of the claim and determined that "there was sufficient evidence to find the requisite nexus between the [criminal possession] and the serious injury inflicted on Marquez." See Cherry v. Walsh, 2009 WL 2611225, at *11 (E.D.N.Y. Aug. 25, 2009). Specifically, he held that "[t]he assault was intended to prevent the detectives—who might have been and in fact were armed—from taking possession of the weapons during the robbery." Id. While Judge Gleeson is a brilliant and thoughtful judge, I am unable to join in this interpretation of the evidence presented in this case.

## CONCLUSION

Langston's petition is granted as to Count One and denied as to Count Two. Respondent is directed to release petitioner from the custody resulting from the judgment of conviction on Count One.[2] The judgment is stayed pending appeal on the condition that, within seven (7) days from the date the judgment is entered, the District Attorney file a notice of appeal and an application for an accelerated briefing and hearing of the appeal.

SO ORDERED.

Brooklyn, New York
July 20, 2010

Corrected:
August 6, 2010

*Edward R. Korman*
Edward R. Korman
Senior United States District Judge

---

[2] Langston was sentenced to five years' imprisonment as a result of his Count Two conviction and has already served this time in full.